**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**MARTINSBURG**

**TROY MCCUMBEE, on behalf of himself**
**and those similarly situated,**

       Plaintiff,

**v.**                       **CIVIL ACTION NO.: 3:22-CV-128**
                                  **(GROH)**

**M PIZZA, INC., et al.,**

       Defendants.

<u>**MEMORANDUM OPINION AND ORDER**</u>
<u>**GRANTING DEFENDANTS' MOTION TO COMPEL ARBITRATION AND**</u>
<u>**GRANTING PLAINTIFF'S MOTION FOR LEAVE TO FILE SUR-REPLY**</u>

This matter is before the Court for consideration of the Defendants' Motion to Compel Arbitration and Dismiss or Stay Proceedings. ECF No. 18. The Plaintiff filed a Response in Opposition [ECF No. 31], and the Defendants entered a Reply [ECF No. 34]. Further, the Plaintiff submitted a Motion for Leave to File Sur-Reply, with the substantive motion attached. ECF No. 36. Similarly, the Defendants filed a Response in Opposition to the Plaintiff's motion [ECF No. 39], and the Plaintiff entered a Reply [ECF No. 40]. Accordingly, both motions are fully briefed and ripe for adjudication. For the reasons that follow, the Court **GRANTS** the Defendants' motion, **GRANTS** the Plaintiff's motion, and **STAYS** this civil action pending the completion of arbitration.

### I.   Factual and Procedural Background

On July 27, 2022, the Plaintiff initiated this civil action by filing a class and collective action complaint. ECF No. 1. Therein, the Plaintiff requests monetary, declaratory, and equitable relief based on the Defendants' alleged failure to compensate the Plaintiff, and

those similarly situated, with minimum wages. The Plaintiff brings his lawsuit before this Court pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201, et seq., and West Virginia wage and hour laws, particularly West Virginia Code § 21-5, et seq.

The Plaintiff is employed as a delivery driver for one of Defendant M Pizza's Domino's Pizza stores, located in Spring Mills, West Virginia. Defendant M Pizza is a domestic corporation that operates Domino's Pizza stores in West Virginia, Maryland, Pennsylvania, and Virginia. Defendant Michael Clise is the President and an incorporator of M Pizza, Inc. Defendant Margaret Clise is the Vice President, CFO, and an incorporator of M Pizza, Inc. Defendant Robert Clise is the Secretary and Treasurer of M Pizza, Inc. All three Clise Defendants have entered into a franchise agreement with Domino's Pizza to operate Domino's stores.

The Plaintiff also named "Doe Corporation 1-10" and "John Doe 1-10" as Defendants in his complaint. As to the Doe Corporation Defendant, the Plaintiff alleges, upon information and belief, that the Defendants own, operate, and control other entities that also compose part of the Defendants' enterprise and qualify as employers of the Plaintiff and other delivery drivers. Similarly, regarding the John Doe Defendant, the Plaintiff asserts that other individuals may exist who qualify as employers of the Plaintiff and other delivery drivers.

The Plaintiff raises four Counts in his complaint. In Count One, the Plaintiff claims that the Defendants require the Plaintiff to pay for automobile expenses and other job-related expenses out of pocket, without reimbursement, in violation of the Fair Labor Standards Act. Similarly, in Count Two, the Plaintiff alleges that the Defendants paid the Plaintiff below minimum wage for the hours he worked by requiring him to cover

automobile expenses and other job-related expenses, in violation of West Virginia Code § 21-5C-2. In Count Three, the Plaintiff asserts that the Defendants have failed to pay the Plaintiff all wages due to him, in violation of West Virginia Code § 21-5-3, which requires the Defendant to pay the Plaintiff due wages at least once every two weeks. Lastly, in Count Four, the Plaintiff brings an unjust enrichment claim asserting that the Plaintiff has conferred a benefit on the Defendants by using his own car to work for Defendants. Altogether, the Plaintiff alleges that the Defendants violated the Fair Labor Standards Act and West Virginia wage and hour laws by failing to adequately reimburse delivery drivers for their delivery-related expenses, resulting in a failure to pay delivery drivers the legally mandated minimum wages for all hours worked.

On September 26, 2022, the Defendants filed a Motion to Compel Arbitration and Dismiss or Stay Proceedings. ECF No. 18. The Plaintiff filed a Response in Opposition [ECF No. 31], and the Defendants entered a Reply [ECF No. 34]. Further, the Plaintiff has submitted a Motion for Leave to File Sur-Reply, with the substantive motion attached. ECF No. 36. Similarly, the Defendants filed a Response in Opposition to the Plaintiff's motion [ECF No. 39], and the Plaintiff entered a Reply [ECF No. 40].

## II.  Applicable Law

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, applies to "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof." 9 U.S.C. § 2. The FAA reflects "a liberal federal policy favoring arbitration agreements." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983). This policy is supported by Congress's view that

arbitration constitutes a more efficient dispute resolution process than litigation. Hightower v. GMRI, Inc., 272 F.3d 239, 241 (4th Cir. 2001). Therefore, "due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration." Adkins v. Labor Ready, Inc., 303 F.3d 496, 500 (4th Cir. 2002) (quoting Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ., 489 U.S. 468, 476 (1989)).

In considering a motion to compel arbitration, the Court applies the same standard as a motion for summary judgment. See Rowland v. Sandy Morris Fin. & Est. Planning Servs., LLC, 993 F.2d 253, 258 (4th Cir. 2021). The party seeking to compel arbitration "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must then "set forth specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). There is no issue for trial unless sufficient evidence exists that favors the nonmoving party and would allow a jury to return a verdict for that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). In making this determination, courts must view the inferences drawn from the underlying facts in the light most favorable to the nonmoving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

Nevertheless, "permissible inference must still be within the range of reasonable probability, ... and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests *merely upon speculation and*

*conjecture*." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (emphasis added) (internal quotations omitted). Judgment as a matter of law is warranted where "a reasonable jury could reach only one conclusion based on the evidence," or when "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005).

By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a jury issue is created," and judgment as a matter of law must be denied. Id. at 489-90. Thus, under the FAA, the party seeking a jury trial "must show *genuine* issues of material fact regarding the existence of an agreement to arbitrate." Galloway v. Santander Consumer USA, Inc., 819 F.3d 79, 85 (4th Cir. 2016) (emphasis added). In determining whether a genuine issue exists, the Court may rely only on facts supported in the record, not simply assertions in the pleadings. Bouchat v. Balt. Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003).

Generally, a district court applies "the federal substantive law of arbitrability, which governs all arbitration agreements encompassed by the FAA." Id. (citations omitted). However, a district court applies ordinary state law principles governing the formation of contracts, "including principles concerning the validity, revocability, or enforceability of contracts." Muriithi v. Shuttle Exp., Inc., 712 F.3d 173, 179 (4th Cir. 2013) (internal citations omitted). Section 2 of the FAA provides that arbitration agreements may be declared unenforceable "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "This saving clause permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or

unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." <u>AT&T Mobility LLC v. Concepcion</u>, 563 U.S. 333, 349 (2011) (quoting <u>Doctor's Assoc., Inc. v. Casarotto</u>, 517 U.S. 681, 687 (1996)).

To compel arbitration under the FAA, the Fourth Circuit requires the moving party

> demonstrate "(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute."

<u>Adkins</u>, 303 F.3d at 500-01 (quoting <u>Whiteside v. Teltech Corp.</u>, 940 F.2d 99, 102 (4th Cir. 1991)). "Under the FAA, courts must stay any suit 'referable to arbitration' under an arbitration agreement, where the court has determined that the agreement so provides, and one of the parties has sought to stay the action." <u>Noohi v. Toll Bros., Inc.</u>, 708 F.3d 599, 604 (4th Cir. 2013).

"A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. Motions to compel arbitration "should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." <u>Zandford v. Prudential-Bache Sec., Inc.</u>, 112 F.3d 723, 727 (4th Cir. 1997) (citations and internal quotation marks omitted). "Indeed, the heavy presumption of arbitrability requires that when the scope of the arbitration clause is open to question, a

court must decide the question in favor of arbitration." Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co., 867 F.2d 809, 812 (4th Cir. 1989) (citing United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960)).

### III.  Analysis

#### A.  Whether the Arbitration Agreement is Valid

"[B]efore referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists." Schein v. Archer & White Sales, Inc., 139 S. Ct. 524, 530 (U.S. 2019). The bulk of the parties' briefing before this Court focuses on the circumstances surrounding the Plaintiff signing the Defendants' Mutual Arbitration Agreement after initiating this civil action. Indeed, the Plaintiff initiated this case on July 27, 2022, and electronically signed the Defendants' Mutual Arbitration Agreement on September 21, 2022. In support of his opposition brief, the Plaintiff presents both legal arguments and serious accusations of wrongdoing. Accordingly, the Court will address the substance of the Plaintiff's opposition brief in detail.

While district courts must apply "the federal substantive law of arbitrability, which governs all arbitration agreements encompassed by the FAA," courts must also apply the ordinary state law principles regarding the formation of contracts, such as the "validity, revocability, or enforceability of contracts generally." Muriithi, 712 F.3d at 179 (internal citations omitted); see also 9 U.S.C. § 2 (providing that arbitration agreements may be unenforceable "upon such grounds as exist at law or in equity of the revocation of any contract"); AT&T Mobility LLC, 563 U.S. at 339. Therefore, this Court must apply principles of West Virginia contract law to determine whether the Arbitration Agreement is enforceable. E.g., Shadahan v. Macy's Corp. Servs., LLC, No. 3:21-CV-38, 2021 WL

4304698, at *3 (N.D.W. Va. Sept. 21, 2021). Under West Virginia law, "[t]he fundamentals of a legal 'contract' are competent parties, legal subject-matter, valuable consideration, and mutual assent. There can be no contract, if there is one of these essential elements upon which the minds of the parties are not in agreement." Ways v. Imation Enter. Corp., 589 S.E.2d 36, 39 (W. Va. 2003).

Further, "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2" of the FAA. See Doctor's Assocs., Inc., 517 U.S. at 687 (citations omitted). Here, the Plaintiff argues that the Arbitration Agreement should not be enforced because mutual assent did not exist and because the agreement is both procedurally and substantively unconscionable.

### i. Mutual Assent

Mutual assent reflects a "meeting of the minds," where one party makes an offer and the other accepts. Messer v. Huntington Anesthesia Grp., Inc., 664 S.E.2d 751, 759 (W. Va. 2008); Ways, 589 S.E.2d at 44. For mutual assent to exist, the parties must have "the same understanding of the terms of the agreement reached." Messer, 664 S.E.2d at 759. "Both the offer and acceptance may be by word, act or conduct that evince the intention of the parties to contract. That their minds have met may be shown by direct evidence of an actual agreement." Ways, 589 S.E.2d at 44. When a party signs a contract, "[a] court can assume that a party to a contract has read and assented to its terms, and absent fraud, misrepresentation, duress, or the like, the court can assume that the parties intended to enforce the contract as drafted." See New v. GameStop, Inc., 753 S.E.2d 62, 76 (W. Va. 2013).

In support of his contention that mutual assent did not exist, the Plaintiff attempts to convince this Court that he never saw the Arbitration Agreement, never signed the agreement, or, if he did sign the agreement, he did not intend to do so. Curiously, the Plaintiff, at one point, floats the idea that he could have, somehow, signed the agreement in the appropriate space without being able to see the agreement. Lastly, the Plaintiff asserts that even if he signed the agreement and his signature is valid, he now revokes his agreement to arbitrate.

The sequence of events that led to the Plaintiff signing the Arbitration Agreement is discussed and detailed at length in the filings submitted by both parties. Upon review of all the filings, the Court finds that mutual assent existed at the time when the Plaintiff electronically signed the Arbitration Agreement. The electronic evidence and metadata submitted by the Defendants is particularly enlightening on this issue, particularly the time stamps, IP addresses, and URLs associated with the form entries. A review of some additional background facts, as the Court finds them, is warranted.

Defendant M Pizza began including the Arbitration Agreement as part of its onboarding process for new employees in 2019. However, the Plaintiff began working for the Defendants two years earlier. At the time this lawsuit was filed, over one thousand delivery drivers currently or previously employed by Defendant M Pizza had signed the Arbitration Agreement. After the filing of this civil action, Defendant M Pizza discovered that some employees, approximately ten percent of its delivery drivers, including the Plaintiff, had not signed an Arbitration Agreement.

Using its Human Resources software, Defendant M Pizza sent an automated text message stating, "Hey [employee's name], M Pizza, Inc. is requesting you update a few

HR forms. You should contact your GM or Rob in HR if you have any concerns. Please select this secure link to complete the request: [Formsite URL]." ECF No. 18-2 at 3. On September 16, 2022, the Plaintiff received this automated text message. The text message linked to three forms: a Background Investigation Information and Consent form, a Team Member Agreement form, and a Mutual Arbitration Agreement form.

On September 21, 2022, the Plaintiff first signed the background investigation form and the team member agreement around 1:00 p.m. in the afternoon. Just after, at approximately 1:20 p.m., the Plaintiff forwarded the link to his counsel for review. The Plaintiff avers that neither he nor his counsel knew that the link contained three separate forms and not simply the first form, even though, at this point, the Plaintiff had already completed not one but two forms using the link. Counsel for the Plaintiff reviewed only the background check form, assuming that the background check form was the only linked form and informed the Plaintiff that he could sign. That night, the Plaintiff revisited the link and electronically signed all three forms.

West Virginia courts have consistently held that "a party to a contract has a duty to read the instrument." Nationstar Mortg., LLC v. West, 785 S.E.2d 634, 641 (W. Va. 2016). In its opposition brief, the Plaintiff argues that he did not see, review, or sign an Arbitration Agreement on September 21, 2022. Yet the evidence before the Court clearly shows the Plaintiff's signature on the Arbitration Agreement, dated September 21, 2022, at 8:34 p.m. Further, the electronic evidence shows that the Plaintiff began viewing this form at 8:29 p.m. and finished viewing the form at 8:34 p.m. Notably, the Plaintiff does not dispute that he spent about five minutes with a linked webpage open in front of him, from 8:29 p.m. to 8:34 p.m., after completing the first two forms. The Plaintiff does not

allege that he exited out of the Defendants' linked webpage after completing the first two forms. Instead, the Plaintiff claims that the third page contained the words "confirm and submit." ECF No. 31 at 4. The Plaintiff also fails to explain why the first two forms loaded correctly, but the third form failed to appear.

To combat the electronic evidence, the Plaintiff first alleges that "[p]erhaps the link was defective and failed to show an arbitration agreement." ECF No. 31 at 9. The Plaintiff offers no evidence to support this theory besides the comment that "technology is finicky." ECF No. 31 at 9. The Plaintiff then alleges that the Arbitration Agreement may have been "intentionally hidden or never present at all." ECF No. 31 at 9. Again, the Plaintiff offers no evidence to substantiate this accusation. The electronic evidence and metadata submitted by the Defendants directly refutes these claims.

Attached to the Defendants' Reply is a table showing the substance of and the metadata created from the submissions entered from the Plaintiff's link. The table shows the five entries submitted by the Plaintiff on September 21, 2022, when the Plaintiff signed the first two forms in the afternoon and then all three forms that night. The table also shows fourteen submissions of random, nonsensical entries, including "abc," "123," "ff," entered between September 23, 2023, and October 12, 2023, from an IP address in Cincinnati, Ohio, where the Plaintiff's counsel is located. Indeed, the Plaintiff's counsel in Cincinnati submitted an affidavit stating that she investigated the link and believes "that the alleged electronic signature was falsified." ECF No. 31-1 at 5. However, at no point in her declaration or in any of the Plaintiff's filings does the Plaintiff provide evidence or even an adequate explanation for how this fraud could have occurred. The Defendants' table

also shows three submissions from an IP address in Newport, Kentucky, where the Plaintiff's forensics investigator is located.

After nearly twenty attempts at manipulating the Defendants' link, surely if any of those submissions created the technological failure that the Plaintiff wishes this Court to believe occurred, the Plaintiff would provide this Court with evidence of the glitch or a detailed explanation describing how and when the glitch occurred during their investigation. The Plaintiff offers no supporting evidence or explanation. Instead, all the electronic evidence before the Court shows that the link functioned properly on repeated occasions.

The Plaintiff provides no credible or plausible support for his assertion that he signed the Arbitration Agreement in the appropriate space without seeing it or knowing about it. Indeed, his signature does not appear to be a duplicate of his signature from either of the two other forms that he does not contest that he signed. The Plaintiff's signature on the third form is similar, but not identical to, the prior two signatures; the third signature shows the expected amount of deviation that one would expect. While the Plaintiff claims, at one point, that the third linked page only contained the words "confirm and submit," this claim is directly refuted by the evidence before the Court.

As much as the Plaintiff alleges that he did not personally sign the electronic form and that his signature is a forgery, the Court finds this allegation of fraud baseless as well. The Plaintiff provides this Court with no supporting documentation to justify an allegation that the Plaintiff's signature was placed on the Arbitration Agreement through fraud or forgery. On the other hand, the Defendants have supplied the Court with overwhelming evidence to the contrary.

While the Plaintiff claims that the evidence provided by the Defendants is insufficient to determine the authenticity of the Arbitration Agreement, this Court disagrees. Under Federal Rule of Evidence 901, a party may authenticate electronically stored information such as e-signatures by "produc[ing] evidence sufficient to support a finding that the item is what the proponent claims it is," including "[t]estimony that an item is what it is claimed to be" or "[e]vidence describing a process or system and showing that it produces an accurate result." Fed. R. Evid. 901(a), (b)(1), (b)(9). The Court finds that the Defendants have met the requirements of Rule 901.

The Defendants submitted an affidavit of Robert Stevens, whose role includes managing both Human Resources and Information Technology for Defendant M Pizza. He possesses personal knowledge of Defendant M Pizza's "HR and IT systems, software, and processes." ECF 18-2 at 1, ¶ 3. Mr. Stevens detailed the evolution of Defendant M Pizza's onboarding process, including the introduction of mutual arbitration agreements in 2019, which, when first introduced, were hand-signed on hard copy forms. ECF 18-2 at 1-2, ¶¶ 5-7. He then explains that Defendant M Pizza switched to electronic arbitration agreements in January 2020. ECF 18-2 at 1-2, ¶ 8. Most significantly, Mr. Stevens walks through the electronic evidence and metadata submitted by the Defendants that details the Plaintiff's actions when accessing, viewing, and, ultimately, signing the Defendants' Arbitration Agreement. ECF 18-2 at 2-5, ¶ 10-20. Mr. Stevens description of events is concretely supported by the attached metadata to the Defendants' motion.

In response to the serious allegations of fraud and forgery alleged by the Plaintiff, the Defendants provided further nuanced detail in their reply. ECF No. 34.  Indeed, as described above, attached to the Defendants' reply is a table showing several

submissions made from the Plaintiff's link by the Plaintiff, by the Plaintiff's counsel, and by the forensic expert hired by the Plaintiff. ECF No. 34-5. Additionally, to combat the Plaintiff's unsubstantiated allegation that the Defendants somehow manipulated the form after the fact, the Defendants include an affidavit from Juan Ruiz, a Senior Manager with BDO USA, LLP,[1] who provides digital forensics and cyber investigation services. ECF No. 34-1 at 1, ¶ 3. Previously, Mr. Ruiz worked for the New York City Cyber Crimes Unit, and, in total, has around thirty years of experience in cyber investigations. ECF No. 34-1 at 1, ¶ 3.

In his affidavit, Mr. Ruiz explains that he reviewed the three forms the Plaintiff signed, as well as three related documents containing the information entered into the forms and the metadata details. ECF No. 34-1 at 2-3, ¶¶ 8-9. After a thorough review of the electronic evidence, Mr. Ruiz found no evidence of tampering. ECF No. 34-1 at 4-5, ¶¶ 14-16. Further, Mr. Ruiz noted that the digital signature on each of the three forms was distinct and "was not copied from one form to the next." ECF No. 34-1 at 5, ¶1 6.

After considering the affidavits and the documents submitted by the Defendants, the Court finds there is no genuine dispute of material fact that the Plaintiff signed and agreed to bound by the arbitration agreement. The Defendants have provided this Court with substantial, concrete evidence detailing the sequence of actions that led to the Plaintiff entering his signature on their Arbitration Agreement. The Plaintiff has offered this Court only baseless, and at times inconsistent, allegations.

Lastly, the Plaintiff argues that he revoked his assent to the arbitration agreement. The Plaintiff provides no legal authority in support of this argument the body of his motion.

---

[1] BDO USA, LLP, is a global professional services firm providing assurance, tax, and financial advisory services to publicly traded and privately held companies.

Later on, in his attached declaration, the Plaintiff states "In the event that I did inadvertently sign an Arbitration Agreement, which I continue to dispute, I revoke the Arbitration Agreement to the extent permitted by any and all laws, regulations, statutes, or otherwise, including but not limited to the ADEA." ECF No. 31-2 at 4.  At no point in any of his filings does the Plaintiff explain what other laws, regulations, or statutes may apply or how the ADEA applies here.

At any rate, the Plaintiff may not unilaterally revoke his assent to the Arbitration Agreement. In paragraph fourteen of the Arbitration Agreement, it provides that "Any agreement contrary to, or modifying, the foregoing arbitration provisions must be entered into, in writing, by the President of the Company." ECF No. 18-2 at 36, ¶ 14. The Plaintiff provides no documentation that a written agreement between the Plaintiff and the President of Defendant M Pizza to forgo the Arbitration Agreement exists. See King v. Ibex Glob., No. 2:15-cv-07236, 2015 WL 6159492, at *2 (S.D.W. Va. Oct. 20, 2015) (finding employee arbitration agreement that could only be revoked or modified in a writing signed by the parties remained in force where there was no evidence of such a writing). The Court finds nothing in the Age Discrimination in Employment Act that supports the Plaintiff's argument that he successfully revoked the Arbitration Agreement. See Bennett v. Dillard's, Inc., 849 F. Supp. 2d 616, 618 (E.D. Va. 2011) (holding arbitration agreement without a 7-day rescission period does not violate the Older Workers Benefit Protection Act, noting that the Act's waiver requirements only apply to substantive rights and an agreement to arbitrate does not waive a substantive right).

Upon review of all the evidence on the record, and viewing the facts in a light most favorable to the Plaintiff, the Court simply cannot find any evidence to support the

Plaintiff's argument; the facts paint a picture contrary to the Plaintiff's story. This Court may rely only upon facts supported by the record, not simply assertions in the pleadings. Shadahan, 2021 WL 4304698, at *2 (citing Bouchat, 346 F.3d at 522). Despite making serious assertions of fraud and forgery, the Plaintiff provides no tangible evidence to support his assertions. Thus, the Plaintiff's assertions are merely that—assertions. The "uncorroborated, self-serving testimony of a plaintiff is not sufficient to create a material dispute of fact sufficient to defeat summary judgment." Shepherd v. Garland, 2022 WL 985867, at *2 (N.D.W. Va. Mar. 31, 2022). Therefore, no genuine dispute on this matter exists.

Indeed, here, the Plaintiff's main argument conjures up scenarios where the Plaintiff somehow drew his signature on a form he never saw or where someone else drew in his signature for him. Despite levying serious accusations of wrongdoing, the Plaintiff offers no factual evidence to support any of his claims. Instead, the only real evidence before the Court shows that the Plaintiff and Plaintiff's counsel were able to open, view, scroll through, and complete all three of the Defendants' forms successfully several times.

Both the Plaintiff and his counsel had an opportunity to view and review the Arbitration Agreement before he signed it. Whether or not the Plaintiff and his counsel reviewed the forms adequately is a responsibility left to them, and the consequences of failing to perform competent due diligence falls on them as well. West Virginia courts have consistently held that "a party to a contract has a duty to read the instrument." Nationstar Mortg., LLC, 785 S.E.2d at 641. When a party signs a contract, "[a] court can assume that a party to a contract has read and assented to its terms, and absent fraud,

misrepresentation, duress, or the like, the court can assume that the parties intended to enforce the contract as drafted." New, 753 S.E.2d at 76.

Here, the evidence before the Court clearly shows the Plaintiff's signature on the Arbitration Agreement, dated September 21, 2022, at 8:34 p.m. Further, the electronic evidence shows that the Plaintiff began viewing this form at 8:29 p.m. and finished viewing the form at 8:34 p.m. That the Plaintiff might have signed the Arbitration Agreement without reading it thoroughly "does not excuse him from the binding effect of the agreements contained therein." Shadahan, 2021 WL 4304698, at *3. The possibility that the Plaintiff, or the Plaintiff's counsel, now experiences buyer's remorse is not an adequate defense to enforceability. Accordingly, finding no evidence to the contrary, the Court finds that mutual assent existed at the time the Plaintiff signed the Arbitration Agreement.

### ii. Unconscionability

The Plaintiff's next defense to the enforceability of the Arbitration Agreement alleges that the agreement is both procedurally and substantively unconscionable. When considering whether a contract is unconscionable, courts must consider the specific provision at issue from *both* a substantive and procedural perspective and find *both* exist. State ex rel. Johnson Controls, Inc. v. Tucker, 729 S.E.2d 808, 817 (W. Va. 2012); see also House v. Rent-A-Ctr. Franchising Int'l, Inc., No. CV 3:16-06654, 2016 WL 7394552, at *5 (S.D.W. Va. Dec. 21, 2016) ("West Virginia law requires a party to prove both procedural and substantive unconscionability."). The degree of substantive and procedural unconscionability needed to find a contract unenforceable is not a defined point. Rather, it is a "sliding scale" with "the more substantively oppressive the contract

term, the less evidence of procedural unconscionability is required to come to the conclusion that the clause is unenforceable, and vice versa." Robinson v. Quicken Loans Inc., 988 F. Supp. 2d 615, 623 (S.D.W. Va. 2013).

### a. Procedural Unconscionability

When analyzing a contract clause for procedural unconscionability, courts must investigate for "inequities, improprieties, or unfairness in the bargaining process and formation of the contract." Mey v. DIRECTV, LLC, No. 5:17-CV-179, 2021 WL 973454, at *4 (N.D.W. Va. Feb. 12, 2021) (quoting Brown v. Genesis Healthcare Corp., 729 S.E.2d 217, 227 (W. Va. 2012)). Procedural unconscionability occurs when there is a "lack of a real and voluntary meeting of the minds of the parties, considering all the circumstances surrounding the transaction." Brown, 729 S.E.2d at 227. Evidence of procedural unconscionability can be found in "the age, literacy, or lack of sophistication of a party; hidden or unduly complex contract terms; the adhesive nature of the contract; and the manner and setting in which the contract was formed, including whether each party had a reasonable opportunity to understand the terms of the contract." Id.

First, the Plaintiff argues that the Arbitration Agreement is a contract of adhesion. The West Virginia Supreme Court cautions courts to scrutinize contracts of adhesion carefully, particularly if the contract includes provisions that would deter enforcement and vindication of rights, protections, relief, and remedies otherwise available under the law. Id. at 228. "A contract of adhesion should receive greater scrutiny than a contract with bargained-for terms to determine if it imposes terms that are oppressive, unconscionable or beyond the reasonable expectations of an ordinary person." Id. However, "finding that there is an adhesion contract is the beginning point for analysis, not the end of it; what courts aim at doing is distinguishing good adhesion

contracts which should be enforced from bad adhesion contracts which should not." State ex rel. Ocwen Loan Servicing, LLC v. Webster, 752 S.E.2d 372, 389 (W. Va. 2013).

In support, the Plaintiff offers no more than a regurgitation of the characteristics of a contract of adhesion as they apply to the Arbitration Agreement.[2] While the Plaintiff may prefer that the Court's analysis ends there, it does not. Simply finding that a contract is a contract of adhesion does not equate to a finding of unconscionability. Webster, 752 S.E.2d at 389. "[A] rule automatically invalidating adhesion contracts would be completely unworkable." Pingley v. Perfection Plus Turbo-Dry, LLC, 746 S.E.2d 544, 550 (W. Va. 2013). Therefore, without any other factors to consider, this Court finds that the Arbitration Agreement does not qualify as the type of "bad adhesion contract" that courts should not enforce. See Webster, 752 S.E.2d at 389.

Next, the Plaintiff argues that he has multiple learning disabilities that affect his reading comprehension. Indeed, the Plaintiff has repeatedly mentioned suffering from learning disabilities, but at no point in any of his filings does the Plaintiff identify a single diagnosis or produce any evidence documenting a diagnosis, treatment, or accommodations. At most, the Plaintiff explains that his disabilities affect his ability to understand electronic documents.

The Court does not find the Plaintiff's vague and unsubstantiated disability argument persuasive. West Virginia courts have long required individuals claiming illiteracy to acquaint themselves with the content of a contract before signing it:

> One is never required to, and never should, execute any written instrument without first becoming fully acquainted with its contents. He should read it, if able; or if illiterate, have it read to him. And when he has signed a written

---

[2] Once again, the Plaintiff alleges that he "did not even see the purported arbitration [agreement] before it was allegedly signed." ECF No. 31 at 12 (insertion not in original). Again, the Plaintiff provides no evidence in support of this assertion.

contract, the law prima facie presumes that he discharged his duty; therefore, whether in fact he did it, or chose to waive the privilege, his signature binds him.

Whittaker v. Sw. Va. Imp. Co., 12 S.E. 507, 511 (W. Va. 1890) (quoting Joel Prentiss Bishop, Commentaries on the Law of Contracts Upon a New and Condensed Method, § 346 (1887)). While the Plaintiff may not be entirely illiterate, he seems to argue that he is something along the lines of electronically illiterate.

Even still, while he seeks to place the burden on the Defendants to proactively assist him with reading electronic documents, the opposite is actually true. See, e.g., Reyes v. Gracefully, Inc., No. 17-CV-9328, 2018 WL 2209486, at *3 (S.D.N.Y. May 11, 2018) (stating the employee had a duty of "making a reasonable effort to have the document explained to him"); Molina v. Coca-Cola Enters., Inc., No. 8-CV-6370, 2009 WL 1606433, at *8 (W.D.N.Y. June 8, 2009) ("The mere fact that plaintiff does not understand English is insufficient to set aside the arbitration agreement since he is presumed to know its contents and to has assented to its terms ... Cases have consistently held that a person who does not understand English must make a reasonable effort to have an agreement made clear to him."). Further, the evidence before the Court reflects that the Plaintiff attempted to seek assistance from his counsel. Whether his counsel adequately assisted him is far less clear.

Lastly, the Plaintiff argues that a gross inequality of bargaining power exists between the parties. Even so, a simple imbalance of bargaining power falls far short of the type of "gross inadequacy" required to show procedural unconscionability. See Tucker, 729 S.E.2d at 817. In support, the Plaintiff argues that he is a minimum wage worker, and the Defendants are a sophisticated business enterprise. In Adkins, the Fourth Circuit did not find that a gross inadequacy of bargaining power existed when the plaintiffs

did not complete high school, were paid at or near the minimum wage, lived in low-income neighborhoods, and did not know what arbitration was, while the defendant was "a large, sophisticated, international corporation." Adkins, 303 F.3d 496, 501 (4th Cir. 2002). The facts before this Court similarly do not qualify as the type of "gross inadequacy" required to show procedural unconscionability.

Therefore, upon review, the Court finds no evidence of procedural unconscionability in the Arbitration Agreement. For a contract to be unconscionable, both procedural and substantive unconscionability must exist. Tucker, 729 S.E.2d at 817. While finding procedural unconscionability lacking is enough to dispel unconscionability concerns, the Court will still examine the Arbitration Agreement for substantive unconscionability as well.

### b. Substantive Unconscionability

When analyzing a contract for substantive unconscionability, a court must look to terms of the contract itself to determine whether a "term is one-sided and will have an overly harsh effect on the disadvantaged party." Webster, 752 S.E.2d at 389. There are no set factors for courts to weigh as the analysis will vary based on the content of the agreement. Nonetheless, courts generally "consider the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and public policy concerns." Id.

In support, the Plaintiff raises concerns surrounding the process of signing of the Arbitration Agreement rather than the terms of the contract itself. Neither argument raised by the Plaintiff pertains to substantive unconscionability. Indeed, at no point during this

portion of the Plaintiff's brief does the Plaintiff cite or refer to any specific provision of the Arbitration Agreement.

First, the Plaintiff argues that it was improper for the Defendants to contact the Plaintiff during litigation, citing the ABA Model and West Virginia Rules of Professional Conduct. Yet those rules only apply to attorneys and there is no evidence before this Court that the Defendants' attorneys, or even any of the individual Defendants, contacted the Plaintiff. Instead, the communication at issue originated from Human Resources' software.  It is unrealistic for the Plaintiff to assume that he would not be contacted by any superior during this lawsuit if he remains employed. Indeed, no case law supports this proposition.

Second, the Plaintiff briefly asserts that it was improper for the Defendants to not specifically inform him that signing the Arbitration Agreement would prohibit him from continuing with this civil action. As discussed above, this is not a persuasive argument. It is the Plaintiff's responsibility to read and understand contracts that he places his signature upon. Whittaker, 12 S.E. at 51; New, 753 S.E.2d at 76; Nationstar Mortg., LLC, 785 S.E.2d at 641; Shadahan, 2021 WL 4304698, at *3; Reyes, 2018 WL 2209486, at *3.

Essentially, the Plaintiff does not provide any arguments that address substantive unconscionability. See, e.g., Bennett v. Skyline Corp., 52 F. Supp. 3d 796, 810 (N.D.W. Va. 2014) (noting "the distinction between procedural unconscionability, usually concerned with unfairness in the bargaining process and formation of the contract, and substantive unconscionability, which is concerned with fairness in the contract itself"). Without identifying a single line of the agreement as unfair, the Plaintiff has failed to show an indica of substantive unconscionability. For a contract to be unconscionable, both

procedural and substantive unconscionability must exist. <u>Tucker</u>, 729 S.E.2d at 817. Accordingly, having found that the Arbitration Agreement is neither procedurally nor substantively unconscionable, the Court finds the agreement enforceable.

**B.  Whether the Arbitration Provision Governs this Action**

Having found that the arbitration provision is enforceable, the Court must now determine whether the arbitration provision governs this civil action, either in full or in part. To compel arbitration under the FAA, the Fourth Circuit requires a moving party

> demonstrate "(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute."

<u>Adkins</u>, 303 F.3d at 500-01 (quoting <u>Whiteside</u>, 940 F.2d at 102). The Defendants assert that their motion satisfies each factor required by the Fourth Circuit. While the Plaintiff fails to identify his argument on this issue clearly, the Court interprets his retroactivity argument as disputing the second <u>Adkins</u> factor.

**i.  Existence of a Dispute**

First, the Court finds a dispute exists. The Plaintiff's complaint alleges that the Defendants violated the Fair Labor Standards Act and West Virginia wage and hour laws by failing to adequately reimburse delivery drivers for their delivery-related expenses, resulting in a failure to pay delivery drivers the legally mandated minimum wages for all hours worked. Indeed, simply by filing a lawsuit against the Defendants, a dispute exists. <u>Canyon Sudar Partners, LLC v. Cole ex rel. Haynie</u>, No. CIV.A. 3:10-1001, 2011 WL

1233320, at *11 (S.D.W. Va. Mar. 29, 2011) (finding a dispute exists because a lawsuit was filed).

### ii. Written Agreement that Covers the Dispute

The second Adkins factor comprises two components: (1) whether a written agreement exists and (2) whether that agreement covers the dispute. First, the Arbitration Agreement clearly constitutes a written agreement. Despite the Plaintiff's assertion that he "did not see any arbitration agreement," the evidence before the Court shows that the Arbitration Agreement exists as a written agreement. The parties further disagree over whether the Arbitration Agreement covers their dispute, particularly as to whether the Arbitration Agreement covers claims previously filed.

First, the Plaintiff argues that the Arbitration Agreement lacks an explicit statement that the agreement applies retroactively. Next, the Plaintiff argues that the verb tense used in the Arbitration Agreement implies that the Defendants did not intend for their agreement to apply retroactively. Specifically, the Plaintiff argues that the Arbitration Agreement uses present-tense and future-tense verbs, as opposed to past or present-perfect tense verbs. The Plaintiff cites to precedent from the Tenth and Sixth Circuits to support his arguments.

The Court finds neither argument persuasive, and none of the case law cited by the Plaintiff controlling. Upon review of the Arbitration Agreement, the Court finds that it does cover the dispute underlying this civil action. The first paragraph of the Arbitration Agreement plainly states

> *any and all disputes* that may occur between Employee and Company arising out of, or related in any way to, Employee's employment with the Company, performance of services to and for the Company, and/or termination of employment with the Company, including *both pre-*

24

*employment and post-employment conduct*, shall be resolved exclusively through final and binding arbitration as set forth herein.

ECF No. 18-2 at 7, ¶ 1 (emphasis added). Similarly, paragraph two of the Arbitration Agreement begins by identifying "*any and all **past**, **present**, and future* claims, disputes, controversies, and *suits of any kind* out of or relating to Employee's employment by Company" as covered by the Arbitration Agreement. ECF No. 18-2 at 7, ¶ 2 (emphasis added). Paragraph two also covers the substance of the Plaintiff's claims as it identifies lawsuits related to wages under the Fair Labor Standards Act and West Virginia state law.

Lastly, the Arbitration Agreement ends with a paragraph written in bold, capitalized font that concludes with "WE UNDERSTAND THAT WE WILL BE REQUIRED TO ARBITRATE ALL DISPUTES WITH THE COMPANY THAT ARE COVERED BY THIS ARBITRATION AGREEMENT, WE ALSO UNDERSTAND THAT THIS ARBITRATION AGREEMENT CONTAINS A WAIVER OF JURY TRIAL OR TRIAL BEFORE A COURT." ECF No. 18-2 at 11. Altogether, the Arbitration Agreement includes broad language that covers the Plaintiff's claims in this matter.

"[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." Moses H. Cone Mem'l Hosp., 460 U.S. at 24-25. Indeed, precedent in this Circuit supports the Court's finding. "The 'heavy presumption of arbitrability requires that when the scope of the arbitration clause is open to question, a court must decide the question in favor of arbitration.'" Levin v. Alms & Assocs., Inc., 634 F.3d 260, 266 (4th Cir. 2011) (quoting Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co., 867 F.2d 809, 812 (4th Cir. 1989)). Disputes about the scope of an arbitration agreement must be resolved

25

in favor of arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." Am. Recovery Corp. v. Computerized Thermal Imaging, Inc., 96 F.3d 88, 92 (4th Cir. 1996) (internal quotation omitted).

In Levin, the Fourth Circuit analyzed two contract provisions: the "agreement encompasses and embodies all terms, understandings and agreements by and between those parties" and "[a]ny dispute shall be submitted to binding arbitration." 634 F.3d at 267. The appellee similarly argued that "the arbitration provision's 'any dispute' language refers only to disputes arising after the signing of the 2007 CFO agreement." Id.

The Fourth Circuit rejected the appellee's argument and found that the two clauses were "broad enough to encompass all agreements and any disputes, past and present, especially given that the presumption in favor of arbitrability is particularly applicable when the arbitration clause is broadly worded." Id. The Fourth Circuit did acknowledge that the agreement between parties did not include an explicit provision stating that the parties must arbitrate "claims accruing before the 2007 Agreement." Id. Nonetheless, the Fourth Circuit explained that "courts have generally applied broad 'any dispute' language *retroactively*, especially when combined with language that refers to all dealings between the parties." Id. (emphasis added).

The Defendants' Arbitration Agreement before this Court includes similar broad language: "any and all disputes," in paragraph one, "any and all past, present, and future claims, disputes, controversies, and suits of any kind," in paragraph two, and "ALL DISPUTES" in the concluding paragraph. Under the Fourth Circuit's precedent, this

language more than justifies a retroactive application of the Defendants' Arbitration Agreement.

Further, as an example, the Fourth Circuit highlighted its decision in Cara's Notions v. Hallmark Cards, when the court "applied *retroactively* an arbitration clause that stated that the parties would arbitrate '[a]ny controversy or claim arising out of or relating to this Agreement, or the breach thereof, or any aspects of the relationship between' the parties.'" Levin, 634 F.3d at 267 (emphasis added) (quoting Cara's Notions v. Hallmark Cards, 140 F.3d 566, 568 (4th Cir. 1998)).  In Cara's Notions, the Fourth Circuit "found relevant a separate section of the agreement that stated '[t]his agreement supersedes all prior oral or written representations and constitutes the entire understanding.'" 140 F.3d at 570. The Defendants' Arbitration Agreement before this Court includes similar language: "This agreement supersedes any and all prior agreements between the parties regarding arbitration, including, but not limited to, any arbitration provisions in employment applications." ECF No. 18-2 at 11, ¶ 14. This language further bolsters the Court's finding that the Defendants' Arbitration Agreement applies retroactively.

Upon review of the Arbitration Agreement and controlling Fourth Circuit precedent, the Court finds that the Defendants' Arbitration Agreement qualifies as a written agreement that includes an arbitration provision that purports to cover the dispute underlying this civil action. Therefore, the second Adkins factor is fully satisfied.

### iii. Relationship to Interstate or Foreign Commerce

Next, the Court finds that third Adkins factor is satisfied as well. The Defendants' Arbitration Agreement states that "This Arbitration Agreement will be governed by the Federal Arbitration Act (FAA) and involves a transaction in interstate commerce." ECF

No. 18-2 at 10, ¶ 13. At no point does the Plaintiff argue that the Arbitration Agreement does not involve interstate commerce.

Further, courts "in deciding to apply the FAA [] need not identify any specific effect upon interstate commerce, so long as 'in the aggregate the economic activity in question would represent 'a general practice subject to federal control.'" Rota-McLarty v. Santander Consumer USA, Inc., 700 F.3d 690, 697-98 (4th Cir. 2012) (quoting Citizens Bank v. Alafabco, Inc., 539 U.S. 52, 56-57 (2003)). The Supreme Court has opined that the FAA's requirement that the contract "'involv[e] commerce' should be broadly construed to 'mean a full exercise of constitutional power signaling Congress' intent to exercise its commerce power to the full.'" Ghouri v. AmSher Collection Servs. Inc., No. 122CV00503RDAJFA, 2022 WL 11964565, at *5 (E.D. Va. Oct. 19, 2022) (cleaned up) (quoting Allied-Bruce Terminix Cos., Inc. v. Dobson, 513 U.S. 265, 277 (1995)). Moreover, the Fourth Circuit does not require parties to affirmatively demonstrate that this element has been met. Rota-McLarty, 700 F.3d at 697 ("[T]he FAA does not impose a burden upon the party invoking the FAA to put forth specific evidence proving the interstate nature of the transaction.").

Indeed, the Plaintiff's complaint explains that Defendant M Pizza is a domestic corporation that operates Domino's Pizza stores in West Virginia, Maryland, Pennsylvania, and Virginia. In his complaint, the Plaintiff further alleges that the Defendants own, operate, and control other entities that also compose part of the Defendants' enterprise and likely qualify as "employers" of the Plaintiff and other delivery drivers. Similarly, the Plaintiff asserts that other individuals may exist who qualify as "employers" of the Plaintiff and other delivery drivers. Given the scope of Defendant M

Pizza's operation, the Plaintiff's dispute likely involves delivery drivers, supervisors, and other entities located across state borders. See Cochran v. Coffman, No. 2:09-CV-00204, 2010 WL 417422, at *3 (S.D.W. Va. Jan. 28, 2010) (finding the third Adkins factor satisfied, in part because the parties' "business relationships cross interstate lines"). Thus, the Court is satisfied that the Defendants' Arbitration Agreement involves interstate commerce.

### iv. Failure, Neglect, or Refusal of a Party to Arbitrate

Lastly, the fourth Adkins factor is satisfied. The Plaintiff explicitly and adamantly refuses to engage in arbitration with the Defendants. Therefore, this Court finds that all four of the Adkins factors are satisfied. Accordingly, having already found the Defendants' Arbitration Agreement enforceable, this Court finds that arbitration should be compelled under the FAA.

### v. Denial as Sanction

The final argument presented by the Plaintiff requests that this Court deny the Defendants' motion to compel arbitration as a means to sanction the Defendants' counsel for improper conduct. The Court will not do so. The Plaintiff asserts that "[p]ermitting the actions of the Defendants to go unpunished would cause extreme prejudice to the judicial system." ECF No. 31 at 20. The Court does not so find.

"Two factors specifically inform our inquiry into actual prejudice: (1) the amount of the delay; and (2) the extent of the moving party's trial-oriented activity." Degidio v. Crazy Horse Saloon & Rest. Inc, 880 F.3d 135, 140 (4th Cir. 2018). The Court finds that both factors favor granting the Defendants' motion. Indeed, the facts before this Court and the Fourth Circuit in Crazy Horse are starkly different. In Crazy Horse, the defendant

"employed judicial proceedings to pursue a litigation strategy *for over three years*" before moving to compel arbitration. Id. at 141(emphasis added). Here, the Defendants filed their motion just two months after the Plaintiff initiated this action.

Further, by the time the defendant in <u>Crazy Horse</u> filed for arbitration, it had already "filed multiple motions for summary judgment, served discovery, and twice asked the district court to certify questions of state law" to the state supreme court. Id. Here, the Defendants motion to compel is their first substantive motion. Indeed, before filing their motion to compel, the Defendants only filed a Consent Motion to Extend Deadline to Respond to Motion to Send Notice. ECF No. 13. Lastly, the defendant in <u>Crazy Horse</u> did not begin to execute arbitration agreements with any of its employees until a year into litigation. Here, the Defendants began administering the Arbitration Agreement as part of its onboarding process years before the Plaintiff filed his complaint in this case.

In affirming the district court's denial of the motion to compel arbitration, the Fourth Circuit noted that granting the motion to compel so late in litigation "would give defendants a perverse incentive to wait as long as possible to compel arbitration." Id. at 142. The Fourth Circuit went on to further explain that when arbitration "agreements are executed during the pendency of litigation, there is an increased risk that arbitration will operate not to expedite the resolution of disputes, but to prolong the entire process and to give defendants a second opportunity to contest unfavorable judgments." Id.

Notably, the Fourth Circuit did not state that arbitration agreements executed after litigation begins are unenforceable. Instead, the Fourth Circuit only highlighted that it increases the risk that the underlying disputes will not be resolved expeditiously. Id. Here, that is not a concern because the Defendants' motion to compel was filed promptly at the

beginning of litigation. Accordingly, the Court finds that the timing of the signing of the Arbitration Agreement was not improper, and denial as a sanction is not warranted.

Next, in support of his sanctions argument, the Plaintiff asserts that the Defendants directly contacted him multiple times to have him sign an arbitration agreement. Like many of the serious allegations the Plaintiff has levied before this Court in this case, the Plaintiff, once again, makes an accusation of wrongdoing with no factual evidence to support it. The Plaintiff provides no documentation showing that any of the individual Defendants, or their counsel, contacted the Plaintiff. The communication at issue is an automated text message originating from the Human Resource department's software.

As discussed above, it would be unrealistic for the Plaintiff to expect to continue working while having no contact with his employer. If this were the case, it is unclear how the Plaintiff would know when he is scheduled to work or what his duties are on any given day. Notably, the Plaintiff does not cite any communication originating from defense counsel or any of the individual Defendants. Therefore, the Court finds no improper behavior occurred that warrants a refusal to enforce the agreement, let alone a denial of the motion as a sanction.

### C. Plaintiff's Motion for Surreply

After the Defendants filed their reply, the Plaintiff submitted a Motion for Leave to File Sur-Reply. ECF No. 36. Therein, the Plaintiff argues that the Defendants raised new issues, arguments, and evidence in their reply that they did not offer in their original motion. The Defendants have filed a Response opposing the Plaintiff's motion [ECF No. 39], and the Plaintiffs have entered a Reply [ECF No. 40]. Accordingly, the Plaintiff's motion has been fully briefed and is ripe for adjudication.

Local Rule of Civil Procedure 7.02(b)(3) provides that "[p]arties shall not file surreply memoranda except by leave of court." A surreply is generally permitted when a party seeks to respond to new material that an opposing party introduced in its reply brief. See Greene, ex rel. C.G. v. Nationwide Mut. Ins. Co., Civil Action No. 5:09-CV-134, 2010 WL 892211, *1 (N.D. W. Va. Mar. 10, 2010). If a court does not rely on the new material raised in the party's reply brief to reach its decision in a matter, then a surreply is irrelevant and unnecessary. See E.E.O.C. v. LA Weight Loss, 509 F. Supp. 2d 527, 540 (D. Md. 2007) (denying the parties' motions to file surreplies because the court did not rely on the new case law and evidence in making its decision).

If a Court finds that it will rely on information provided in the reply, the filing is thus not superfluous or unnecessary. See Tube City IMS, LLC v. Severstal U.S. Holdings, LLC, Civil Action No. 5:12-CV-31, 2014 WL 4385857, *3-*4 (N.D. W. Va. Sept. 4, 2014) (granting motion for leave to file surreply when a reply provided much more in-depth argument than an initial motion and the court found it would rely on the information provided). Additionally, a surreply is warranted when it provides a party the opportunity to address newly cited and relied upon case law. See Anderson v. Consol. Coal Co., Civ. Action No. 1:11-CV-138, 2013 WL 1910377, *4 (N.D. W. Va. May 8, 2013) (granting leave to file surreply that specifically responded to new case law cited for the first time in reply brief). However, if the "new" arguments are "more correctly characterized as responsive arguments to the claim's raised in the [nonmoving party's] opposition brief," then a surreply is not warranted. EEOC v. Freeman, 961 F. Supp. 2d 783, 801 (D. Md. 2013), aff'd in part sub nom. E.E.O.C. v. Freeman, 778 F.3d 463 (4th Cir. 2015).

In their reply, the Defendants did provide the Court with new and material evidence that the Court considered in its adjudication of the Defendants' motion to compel arbitration. But that evidence was provided in direct response to the Plaintiff's serious, and, so far, unsubstantiated, claims of fraud and forgery. While the Court finds that the information provided in the Defendants' reply is most correctly characterized as responsive arguments to the claims raised in the Plaintiff's opposition brief and likely falls within the <u>Freeman</u> exception, the Court will review the Plaintiff's surreply because the issues raised before the Court are serious.

Accordingly, the Court exercises its discretion to grant the Plaintiff leave to file a surreply.  The Plaintiff attached its substantive filing to its motion for leave. Therefore, the Court **GRANTS** the Plaintiff's Motion for Leave to File Sur-Reply [ECF No. 36] and **DIRECTS** the Clerk of Court to file the Surreply attached to the Plaintiff's Motion [ECF No. 36-1] on the docket.

Upon review of the Plaintiff's Surreply, the Court is dismayed to find that the Plaintiff still failed to provide any concrete evidence in support of its accusations. In   his surreply, the Plaintiff goes so far as to allege "that Defendants had Mr. McCumbee sign a webpage that did not contain the arbitration agreement but later, using the technological tools at their disposal, modified the underlying records to make it appear as if it always showed an arbitration agreement." ECF No. 36-1 at 3. The Plaintiff does not provide further detail or supporting documentation to substantiate this claim. The Court has reviewed all the digital evidence and metadata filed in this case, including the data showing the Plaintiff's counsel own failed attempts at manipulating the electronic form to

produce its desired result, and finds that the Plaintiff has failed to establish a genuine dispute exists on the arbitration issue.

The Plaintiff continues on to request a jury trial to determine the validity of the arbitration agreement. Based on the complete lack of evidence offered to the Court, the Plaintiff is not entitled to a jury trial. See Vandelinde v. Priority Auto. Roanoke, Inc., No. 7:20-CV-00330, 2021 WL 1113635, *4 (W.D. Va. Mar. 23, 2021) (holding that, where plaintiff claimed signature on arbitration agreement was forged despite "significant evidence" from defendant that it was authentic, the parties may not proceed to trial on the signature issue unless plaintiff presents specific evidence of forgery, noting "[m]erely discrediting [defendant's] evidence that the signature is valid, without any evidence of a forgery, will be insufficient"). As analyzed above, this Court finds that the Defendants have satisfactorily authenticated the Plaintiff's signature on the Arbitration Agreement under the requirements set forth in Rule 901 of the Federal Rules of Evidence.

### D. Whether a Dismissal or a Stay is Warranted

Having found that arbitration in this matter should be compelled, the only remaining issue before this Court is whether to stay or dismiss this civil action. Looking only to the statute, the relevant section of the FAA provides that

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3. However, as noted by the Fourth Circuit, tension exists within the Circuit's precedent as to whether a stay or dismissal is appropriate when all claims in a matter are

subject to arbitration. <u>Noohi</u>, 708 F.3d at 605 n.2. Indeed, the Defendants' motion requests that this Court stay or dismiss the case.

Beginning in 2001, the Fourth Circuit has flip flopped on whether a stay or dismissal is appropriate. Indeed, the Fourth Circuit has flip flopped even within the same year. In March 2001, in <u>Bankers</u>, the Circuit cited the FAA's requirement to stay proceedings when an issue is arbitrable and held that "[i]f the issues in the case are within the contemplation of the arbitration agreement, the FAA's stay-of-litigation provision is mandatory, and there is no discretion vested in the district court to deny the stay." <u>United States v. Bankers Ins. Co.</u>, 245 F.3d 315, 319 (4th Cir. 2001). Then, just three months later, the Fourth Circuit held that "[n]otwithstanding the terms of § 3, ... dismissal is a proper remedy when all of the issues presented in a lawsuit are arbitrable." <u>Choice Hotels Int'l, Inc, v. BSR Tropicana Resort, Inc.</u>, 252 F.3d 707, 709-10 (4th Cir. 2001).

Upon review of Fourth Circuit precedent before and after <u>Choice Hotels</u>, this Court finds that most Fourth Circuit precedent supports the issuance of a stay when all issues in a case are arbitrable. <u>E.g.</u>, <u>Hooters of Am., Inc. v. Phillips</u>, 173 F.3d 933, 937 (4th Cir. 1999); <u>Bankers</u>, 245 F.3d at 319; <u>Adkins</u>, 303 F.3d at 500; <u>Noe v. City Nat'l Bank of W. Va.</u>, 828 F. App'x 163, 165 (4th Cir. 2020). But see <u>Choice Hotels</u>, 252 F.3d at 709-10; <u>Wheeling Hosp., Inc. v. Health Plan of the Upper Ohio Valley, Inc.</u>, 683 F.3d 577, 584 (4th Cir. 2012 (citing <u>Choice Hotels</u>)). This principle is bolstered by the text of the FAA directing courts to issue a stay. 9 U.S.C. § 3 ("[U]pon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement.")

Of all the Fourth Circuit precedent governing this issue, this Court finds substantial guidance from <u>Adkins</u>, as it was decided just one year after <u>Choice Hotels</u>, and is an oft-cited decision by courts applying the Fourth Circuit's standard for whether parties should be sent to arbitration.[3] In <u>Adkins</u>, the Fourth Circuit held that the "stay-of-litigation provision is mandatory." 303 F.3d at 500. Given the weight of the precedent supporting a stay as the proper avenue of relief, including the Fourth Circuit's declaration in <u>Adkins</u>, shortly after <u>Choice Hotels</u>, the Court similarly finds that a stay is the appropriate counterpart to a motion to compel arbitration. Therefore, this Court finds that this matter should be stayed pending arbitration.

## IV.   Conclusion

For the reasons stated above, the Court finds that the Defendants' Motion to Compel Arbitration and Dismiss or Stay Proceedings [ECF No. 18] should be, and hereby is, **GRANTED**. The Court **ORDERS** that the Plaintiff's claims be **SUBMITTED TO ARBITRATION**, pursuant to this Court's Order and the parties' agreement to arbitrate. The Court further **ORDERS** that this civil action is hereby **STAYED** pending completion of the arbitration proceeding. The parties are **DIRECTED** to notify this Court forthwith upon the conclusion of the matter.

As noted above, the Court **ORDERS** that the Plaintiff's Motion for Leave to File Sur-Reply [ECF No. 36] be **GRANTED**. The Court **DIRECTS** the Clerk of Court to file the Surreply attached to the Plaintiff's Motion [ECF No. 36-1] on the docket.

---

[3] A Westlaw search shows over four hundred cases citing <u>Adkins</u> as the source for the Fourth Circuit's four-factor test governing motions to compel arbitration.

Pursuant to this Court's Order directing the parties to engage in arbitration and staying this case, the Court **ORDERS** that the remaining motions pending on the docket [ECF Nos. 7, 32, 41] be **TERMINATED as MOOT**.

The Clerk of Court is **DIRECTED** to transmit copies of this Order to all counsel of record herein.

**DATED:** March 30, 2023

GINA M. GROH
UNITED STATES DISTRICT JUDGE